Filed 5/10/21  In re R.K. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re R.K., A Person Coming Under the Juvenile Court Law. | B308256 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.M.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. DK24058 |

APPEAL from an order of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Reversed with directions.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

Mother appeals from the juvenile court's August 18, 2020 order summarily denying her Welfare and Institutions Code[1] section 388, subdivision (a)(1) petition that asked the court to return her then-four-year-old son R.K. to her custody or, alternatively, to reinstate her family reunification services. Because we conclude the juvenile court abused its discretion, we reverse and remand the matter for an evidentiary hearing.

**FACTS AND PROCEDURAL BACKGROUND**

1. *General background*

Mother gave birth to R.K. in November 2015.[2] Between January 2016 and July 2017, the Los Angeles County Department of Children and Family Services (DCFS) investigated allegations of mother's general neglect and abuse of R.K.[3] DCFS determined those allegations were either unfounded or inconclusive.

After R.K.'s birth, mother was arrested twice: in January 2016 for making threats with intent to terrorize and vandalism,

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] R.K.'s father is not a party to this appeal.

[3] Among other things, mother allegedly prostituted and used drugs in front of R.K., left R.K. with strangers or other inappropriate babysitters, and neglected his healthcare. She also was involved in an incident where she allegedly got into a fight and broke the windows out of a car with a bat. DCFS noted it received reports of several of the allegations due to an ongoing dispute among mother, father and the mother of father's older children, Lisa.

and in May 2016 for loitering for prostitution. (She also had a juvenile criminal history.) In May 2016, she was convicted of criminal threats and vandalism after pleading no contest. In December 2017, she was placed on probation for three years.[4] In May 2016, the criminal court also issued a three-year protective order protecting father and Lisa from mother.[5] Mother was convicted of a misdemeanor on her intent to prostitute charge in July 2016 and sentenced to three years' probation.

## 2. *Events leading to dependency*

In July 2017, mother and R.K., who was about 20 months old, were out with a man she had met on a dating site. Mother left R.K. with her date while she went inside a Carl's Jr.[6] When she came out, her date had left with R.K. and did not return. More than three hours later, at about 10:30 p.m., mother reported her son missing at a sheriff's station, but left before completing the report.

Sheriff's deputies began a search. They could not reach mother and waited at her home. Mother returned home with her son at about 3:00 a.m. She told the deputies she had been out with the man several times before, he had told her not to contact the police, and she had felt she could locate her son on her own.

---

[4] Before placing mother on formal probation, the court ordered her to complete a 26-session anger management counseling program and, from what we can tell, 52 sessions of domestic violence counseling.

[5] Lisa apparently was the victim of mother's threats and vandalism.

[6] The exact details are unclear.

Mother did not explain why she waited three hours to report her son missing. R.K. was taken into custody for child endangerment. Mother's family told the investigating deputy that mother had a history of prostitution, drug use, and mental illness.

Later that day, a DCFS social worker interviewed mother. Mother said she did not return home or answer her phone after reporting R.K. missing because she wanted to stay in contact with the man—he had told her not to contact the police and said he would drop off her son. Mother's friend took her to pick up R.K. and then dropped them off near mother's home.

Mother appeared to be under the influence during the interview. She told the social worker she had smoked marijuana and taken a Vicodin for a toothache. DCFS also interviewed father and mother's relatives, some of whom confirmed mother had a history of prostitution. One relative believed mother was using drugs.

DCFS placed R.K. in protective custody. On July 26, 2017, DCFS filed a petition under section 300, subdivision (b)(1) alleging mother placed R.K. at risk of harm due to her substance abuse and had endangered R.K. by allowing an unrelated male to have contact with the child resulting in the child's kidnapping for several hours. The juvenile court detained R.K. from mother and ordered she receive monitored visits. Mother was to drug test weekly. She represented she already was enrolled in parenting, domestic violence, and anger management classes.

### 3. *Jurisdiction and disposition*

On August 7, 2017, mother enrolled in an in-patient treatment program but left on August 18, 2017, stating she did not have a drug problem. While there, she tested negative

4

for drugs and alcohol.  Since February 2016, mother had been enrolled in an anger management group at Southern California Counseling Center (SCCC), presumably as part of her probation. A progress letter dated August 10, 2017, noted, "[w]hile [mother] has struggled with substance use, it was not evident in the groups she attended.  Although the group experience was at times challenging for her to implement the coping skills, she would still attend and be present."

On August 25, 2017, DCFS re-interviewed mother about the incident.  Mother told the social worker it was " 'all a misunderstanding.' "  She denied using drugs, but said she had a history of smoking " 'weed' " as a child.  She denied current marijuana use and denied she was under the influence of drugs or alcohol while caring for R.K.  Mother had failed to appear for on-demand drug testing on July 24 and 25, 2017.  DCFS described mother as "marginally cooperative." It reported she "became increasingly upset and argumentative" during the interview and ultimately left.

Mother pleaded no contest to the petition.  On September 20, 2017, the juvenile court sustained one of the petition's two counts against mother, amended as follows:

> "The child['s] mother . . . has a[n] unresolved history of substance use, and is a recent user of marijuana, which renders the mother at times incapable of providing regular care for the child.  In July 2017, the mother did not follow up appropriately with law enforcement when minor went missing with an unrelated male.  Said illicit drug use by

5

> the child's mother places the child at risk of
> serious harm."

The juvenile court declared R.K. a dependent, removed him from mother (and father), and ordered DCFS to provide mother with family reunification services and monitored visits. The court ordered mother to participate in a full drug/alcohol program with aftercare, random or on demand drug/alcohol testing, parenting classes, and individual counseling. Mother also was to comply with any criminal court orders and probation conditions.

### 4. *Six-month review period*

During this period, R.K. lived with his maternal great-aunt (MGA), a nurse. He attended daycare while she worked. R.K. began speech therapy,[7] was to begin specialized instruction, and was prescribed an inhaler for his asthma.

Mother was a no show for seven drug tests between September 29 and November 7, 2017.[8] In November 2017, mother enrolled in Behavioral Health Services' (BHS) Pacifica House residential drug treatment center—she tested positive for

---

[7] R.K. showed a 50 percent delay in his communicative development.

[8] Mother also was a no show for testing on November 21, 2017 and December 26, 2018 (she tested negative on December 14, 2017), but at that time she was drug testing through her inpatient treatment program. Their records show she tested negative on November 30, December 4, 17, 27, and 30, 2017, and January 2 and 6, 2018. Mother also tested negative for DCFS on January 3 and 29 and February 6 and 23, 2018.

methamphetamine during intake.[9]  She completed the program on January 9, 2018.

Mother enrolled in an outpatient program with housing that same day, but the program went out of business at the end of February 2018.  During the six weeks mother was enrolled, she had good attendance at her group classes and her counselor had no concerns about mother using any substances.  Mother still needed "to learn more about recovery," however.  According to the counselor, mother had tested for drugs twice and both results were negative.  Mother was participating in 12-step meetings, as well.

Mother attended anger management group sessions and parenting classes through SCCC and completed an eight-week parenting program while at Pacifica House.  Mother did not want to enroll in individual counseling.  DCFS described mother as "engaged in services" and noted "she has been able to address case issues through substance abuse treatment, parenting, anger management and aftercare."  Nevertheless, DCFS remained concerned about mother relapsing.

Mother had been visiting R.K. twice weekly.  DCFS notes state R.K. and mother had a close relationship and "consistent quality visits."  R.K. was attached to and loved his mother.  DCFS approved mother for unmonitored visits on February 27, 2018.

---

[9]     Mother had tried to enroll in Pacifica House in October 2017 but did not qualify.  She later told the social worker that she "used meth for the sole purpose of getting into an inpatient program."

7

In its April 2, 2018 last minute information report (LMI) to the court, DCFS noted mother was currently homeless and staying with a friend. She tested negative at a make-up drug test on March 8, 2018. The LMI described mother as "partially compliant in services" because she had not enrolled in individual counseling.[10] The juvenile court continued the matter for contest on May 31, 2018.

In a second LMI filed May 22, 2018, DCFS noted mother had tested negative for drugs and alcohol at three tests, but had missed two tests. On April 17, 2018, mother had enrolled in a new outpatient treatment program at BHS that included six group classes per week, individual counseling each week, and random drug testing.

In late April, mother did not return R.K. after an unmonitored Friday visit; she kept him over the weekend. DCFS changed mother's visits back to monitored, but recommended reunification services continue. DCFS placed R.K. with a new non-relative caregiver on April 30—the day mother returned R.K.

At the May 31, 2018 contested review hearing, the juvenile court found mother had made partial progress toward alleviating or mitigating the causes of the dependency. The court continued reunification services with monitored visits.

5.    *12-month review period*

As of September 10, 2018, R.K. remained placed with the non-relative caregiver. He received speech and individual

---

[10]    In February 2018, the Department of Mental Health informed mother she did not qualify for its services. DCFS referred mother to counseling elsewhere.

therapy—his speech had improved, and his anger and aggression had decreased.

Mother was compliant with her monitored and unmonitored visits.[11] R.K. was developing a bond with mother. At first, R.K. would throw a tantrum when the caregiver left him with mother. As visits progressed, R.K. became happy to see mother. He called her " 'mommy,' " smiled and walked directly to mother, and stopped throwing a tantrum when the caregiver left. He threw tantrums when the caregiver picked him up because he wanted to stay with mother.

During this time, mother lived in BHS's recovery bridge housing for three months and then moved into her uncle's two-bedroom home. She completed the BHS outpatient treatment program in August 2018 and enrolled in recovery support services. Mother attended at least three group sessions per week, including for parenting and relapse prevention, and met weekly with her individual counselor. Mother participated in random drug testing and her tests had been negative.[12] Mother also enrolled in individual counseling at SCCC. She had attended 13 sessions as of August 13, 2018 and was "progressing positively."

DCFS reported mother had been compliant in all areas of her case plan. Mother had a full-time job, and her uncle was willing to allow her and R.K. to stay with him. Nevertheless,

---

[11] Mother's monitored visits were at the DCFS office. On August 24, 2018, DCFS liberalized mother's visits to five hours of unmonitored visitation weekly.

[12] DCFS noted mother's last 17 tests, from April 17, 2018 to August 22, 2018, had been negative.

the social worker was concerned that mother, who did not have a driver's license, was driving R.K. during visits. Mother denied driving. The social worker also suspected mother was " 'cleaning her system' to test negative" at her drug tests, and " '[t]rapping,' " meaning prostituting, based on text messages purportedly from mother that her former roommate had given the social worker. Mother denied taking drugs, cleaning her system to avoid a positive test, or prostituting. She claimed "people are just, 'hating on her' and do not want to see her get her son back."

DCFS informed the court in its September 26, 2018 LMI that a social worker had seen mother drive R.K. to meet the caregiver. Mother still did not have a driver's license. At a later meeting, mother again denied driving.[13] She also continued to deny trying to cleanse her system or prostituting when DCFS asked her about the text messages.

At the September hearing, the court limited mother's visits to monitored, increased the frequency of mother's testing, and ordered mother not to transport R.K. The review hearing was continued to November 14, 2018.

DCFS submitted two LMIs on November 14, 2018. A social worker had "googled" mother's contact telephone number and discovered a website, "harlothub.com," with a picture of a naked woman looking over her shoulder and covering her breast.

Mother had been a no show for drug testing on September 27, October 23, and November 1, 2018, but tested

---

[13] DCFS personnel watched mother drive away from that meeting, however. She claimed she was "only driving because she had to go to work."

10

negative on July 26 and October 4 and 11, 2018. DCFS noted a counselor from BHS told a social worker that, during a group meeting on September 25, 2018, mother "blurted out that she has been using drugs and that she has been using something to flush out her system."

Mother also was refusing to give the social worker her new telephone number. She was upset that her unmonitored visits with R.K. had been revoked. Nevertheless, mother maintained contact with R.K.'s caregiver and her visits were appropriate. DCFS noted mother and the caregiver appeared to have developed a working relationship.[14] DCFS assigned a new social worker to the case on October 11, 2018. Mother was maintaining weekly contact with her.

Mother enrolled in an inpatient program at BHS's Flossie Lewis center on November 8, 2018. According to a September 25, 2018 progress report, mother's drug tests had been negative. Mother provided evidence of her attendance at 12-step meetings, too.

Mother withdrew her contest at the November 14, 2018 review hearing. The juvenile court found mother partially compliant with her progress and continued her reunification services. The court gave DCFS discretion to liberalize mother's visits upon her further compliance with the case plan.

6.    *18-month review period*

As of January 2019, mother had been maintaining regular, frequent contact with her social worker. She was working

---

[14]    On September 25, 2018, R.K. was placed with a new non-relative caregiver, D.W., a retired LVN.

11

part-time and had obtained stable, subsidized housing through the probation department. Mother had left the BHS inpatient treatment program on December 6, 2018, however, when the probation department referred her to the housing program. BHS noted she had participated in "numerous" groups and classes and tested negative for drugs. Mother enrolled in an outpatient program at Motivational Recovery Services on December 12, 2018. She also continued to participate in individual therapy through SCCC.

During the reporting period, mother's weekly, random DCFS drug tests were negative, and mother continued to test through her outpatient program.

Mother continued to have regular, weekly, monitored visits with R.K. She engaged lovingly with her son and was able to manage his behavior. She brought food, toys, and clothing for him. R.K. appeared to be attached to mother and cried for her when each visit ended. Mother acknowledged she had " 'messed up' " in the past, but said remaining sober was her priority. She did not want to miss "any more moments" of R.K.'s life.

DCFS noted R.K. appeared "to have a loving bond and attachment" with both his parents and the caregiver D.W. D.W. was committed to caring for R.K., now age three, and to ensuring parents had access to him. R.K. was in daycare and appeared to be developing appropriately. D.W. asked that R.K. receive speech therapy and therapy to address his anger and refusal to potty-train, however. The social worker recommended the court grant DCFS discretion to further liberalize visits and continue the matter for further assessment.

On January 28, 2019, the court ordered overnight visits for mother. DCFS could stop them if she missed any tests or

tested dirty.  The court set mother's contest for a possible home of parent order for April 16, 2019.

In its April 4, 2019 interim review report, DCFS noted mother continued to make herself available to the social worker. Mother said she continued to participate in her outpatient program.  Mother's therapist at SCCC said mother maintained regular phone contact with her.  Their last face-to-face meeting was at the end of February 2019 because that agency had terminated mother's services.  The therapist had moved to a new agency, but intended to continue to provide mother with pro bono counseling by telephone.

D.W. continued to provide for R.K., and he appeared to have a "loving bond and attachment" to her.  R.K. also had a strong, healthy bond and attachment to mother.  His speech had improved, and he had begun to potty-train.

Mother began her weekly overnight visits.  In February 2019, mother's social worker made an unannounced visit when R.K. was with mother and saw a pair of men's shoes in the living room.  Mother said they were a gift for a friend.  She denied having any visitors or dating anyone.  She also denied having contact with father, though she said she would be open to joint visits.  The social worker reminded mother she could not communicate with father due to the restraining order.  Mother had overnight visits on February 9, 16, 23, and March 2, 2019.

On March 6, 2019, father accused mother of driving with R.K.  Although the social worker could not verify this, she modified mother's visits to unmonitored day visits at the mall

13

for R.K.'s safety.[15]  Mother's friend called to tell the social worker that she drove mother for visits and father was lying.

Father also told the social worker that mother arrived at a public location where father was meeting his daughter and Lisa.  Mother allegedly confronted and verbally attacked them, and physically attacked and threatened father, yelling, " 'I'll air you out!'  'I'll have you aired out!' "  Father claimed mother had been stalking and contacting him and using R.K. "as 'bait' " to start a conversation.  He alleged mother still used drugs.

Mother described events differently.  She coincidentally arrived at the same location as father and his family.  She also said she was a passenger in the car, not the driver, and Lisa had assaulted her through the car window.

Mother told the social worker father had been living with her since December 10, 2018, because he was homeless.  Father denied living with mother.

On March 23, 2019, the social worker again spoke to mother about these events.  Father continued to claim mother was trying to get in touch with him.  Mother denied the claim, said she was "done" with father, and felt he had tried to " 'sabotage everything' " by lying to DCFS.  She said she had fallen into a depression.

Mother's drug tests were mostly negative during the reporting period.  She missed one drug test on March 21, 2019.  Mother's March 27, 2019 test was positive for amphetamine/

---

[15]     After that, mother had weekly unmonitored visits on Saturdays and some Sundays and called R.K. regularly.

14

methamphetamine. She denied using substances. DCFS immediately restricted mother to monitored visits.

DCFS believed both parents had repeatedly lied and misled the social worker. DCFS believed mother continued to struggle with substance use, anger management, and impulse control. She also had violated the restraining order.[16] It was "clear" to DCFS that "parents' strained and tumultuous relationship with one another ha[d] impacted each of their ability to safely parent [R.K.] and to prioritize [his] needs and wellbeing, over their issues with one another." DCFS recommended the court terminate reunification services.

In its April 16, 2019 LMI, DCFS added that on April 3, 2019, mother's outpatient program had administratively discharged her after she failed to have a required physical exam by February 8, 2019, and had not participated in group sessions since February 27, 2019.

At the April 16, 2019 hearing, the juvenile court found mother's progress to be minimal and terminated reunification services. The court set a permanency planning hearing for August 13, 2019.

7. *Post-reunification development*

In its August 1, 2019 section 366.26 report, DCFS advised the court that D.W. wanted to provide R.K. permanency through a legal guardianship due to R.K.'s ongoing relationship with his parents and extended family. At this point, R.K. had been living with D.W. for more than 10 months. He called D.W. " 'auntie' "

---

[16] The restraining order against mother did not expire until May 2019.

15

and appeared to have a loving bond and attachment to her. D.W. treated R.K. as her own child. She was committed to caring for him, but also hoped to help R.K. maintain his family ties. R.K. was too young to express his wishes.

R.K. continued to visit with mother every Saturday and/or Sunday and had occasional visits with his maternal aunt. D.W. said the visits went well, and R.K. transitioned smoothly. In between visits, mother contacted D.W. to speak to R.K. and to ask about his well-being.

In late June 2019, maternal aunt, who was approved to monitor mother's visits, asked for and was granted an overnight visit. Afterward, the social worker interviewed R.K., who was three at the time. Based on his answers, the social worker believed maternal aunt had allowed mother to have unapproved contact with R.K. at mother's home and that mother had driven R.K. Mother said R.K. was " 'lying' " and she had visited with him, but not at her house. The aunt said they had visited at mother's house but did not spend the night.

Mother remained employed part-time. She told the social worker she planned to continue individual counseling and an outpatient treatment program but did not provide verification of her participation. Between April 5 and July 12, 2019, mother missed eight out of 10 drug tests and had two negative tests.

DCFS filed an LMI the day of the August 13, 2019 hearing to inform the court that two Facebook pages—which appeared to belong to mother—included videos of mother driving a car and implicating herself in gang affiliation, prostitution, and substance use. DCFS found it "clear that [mother's] lifestyle indicates that she is not ready nor willing to parent, nor to change her behaviors."

16

DCFS recommended the court appoint D.W. as R.K.'s legal guardian. The court continued the permanent placement hearing to December 10, 2019, and ordered maternal aunt could no longer monitor mother's visits.

In its September 25, 2019 status review report, DCFS noted mother continued to maintain regular contact, but was "verbally assaultive" and used "foul language" when communicating with the social worker.

R.K. seemed to be well-adjusted in D.W.'s home. He appeared to have a bond and attachment with her, as well as with her extended family members and friends. He had a "loving and friendly relationship" with other children in the home. R.K.'s speech and verbal skills had "greatly improved," as had his ability to manage his anger and frustration.

Mother maintained regular visitation with R.K. every Saturday and Sunday, supervised by D.W. The visits went well and DCFS recommended they continue. Mother also regularly asked D.W. about R.K.'s well-being.

Mother told DCFS she wanted to drug test and to re-enroll in a drug treatment program. DCFS believed mother continued to struggle with substance use and managing her anger. It continued to recommend legal guardianship as R.K.'s permanent plan.

In early October 2019 mother provided DCFS with updated information about her participation in previously-ordered services to provide to the court: mother attended an intake appointment on September 12, 2019 for mental health services but was referred to other agencies; on September 3, 2019, mother re-enrolled in her outpatient treatment program at Motivational Recovery Services where she would be randomly tested bi-weekly

17

and focus on relapse prevention; as of September 30, 2019, mother was participating in employment services through Chrysalis; mother's former therapist was still in touch with her and helping mother find a new counseling facility; mother attended a DCFS parent orientation on September 20, 2019; and on September 24, 2019, mother began participating in services at Anti-Recidivism Coalition (ARC).

On October 15, 2019, the juvenile court ordered legal guardianship as R.K.'s permanent plan.

**8.      *First section 388 petition and section 366.26 hearing***

On December 9, 2019, mother filed a petition under section 388 asking that the court change its April 16, 2019 order terminating her reunification services.  The petition alleged mother "demonstrated that she has rehabilitated by completing an outpatient treatment program, obtaining a sponsor, and participating in individual counseling.  Mother continues to engage in 12-step meetings and aftercare to further address her sobriety.  Mother has addressed the issues that brought this family to the court's attention."

Mother attached letters from her providers dated between November 27 and December 9, 2019, to confirm her progress:

• Motivational Recovery Services confirmed mother had completed its outpatient program; had tested negative for drugs on a monthly basis (twice) since enrolling in September; and had enrolled in recovery supportive services on December 4, 2019; and noted mother "has been able to identify [her] triggers and has developed a plan to deal with these triggers by using her new tools of recovery."

18

- ARC confirmed mother had enrolled in individual counseling and had attended seven weekly therapy sessions since mid-October 2019.
- Mother's sponsor—a certified addiction treatment counselor—noted she became mother's sponsor in August 2019; mother had " 'hit the ground running' to accomplish her goals at establishing a solid foundation in her recovery, in order to sustain her sobriety"; and mother was attending at least four meetings a week and met with her weekly.
- Brilliant Corners confirmed mother had enrolled in its case management and employment services program in August 2018, had made "tremendous progress" during her enrollment, and continued to be engaged in it.

On December 10, 2019, the juvenile court heard argument as to whether mother's petition made a prima facie showing. The court agreed with DCFS that mother's evidence was insufficient "to demonstrate that there is an actual change of circumstance." The court also found mother failed to demonstrate how leaving R.K. "in limbo" while she engaged in additional reunification services—beyond the 18-month maximum already provided—was in R.K.'s best interests. The court allowed mother to argue. She asserted she had been testing negative every week, was visiting R.K. regularly, applying herself, and "still showing up . . . [and] being there for [her] child." Because mother had not met her prima facie burden, the court denied the petition without a hearing.

The court then found R.K. was adoptable, it would be detrimental to R.K. to remove him from D.W.—who was willing to provide R.K. permanence through legal guardianship—and it would be detrimental to return R.K. to either parent's physical

19

custody.  The court granted the guardianship, appointed D.W. legal guardian of R.K., and terminated its jurisdiction.

### 9.    *Second section 388 petition*

On August 3, 2020, mother filed a second section 388 petition asking the court to change its April 16, 2019 order terminating reunification services by either returning R.K. to her custody or reinstating her reunification services.  Mother alleged she now was "living responsibly and independently"; had been sober for "over 10 months"; had a sponsor and attended meetings three to four times a week;[17] had completed various programs, confirmed through exhibits; continued to attend individual therapy; and obtained a full-time job with benefits through the painters' union.  Mother declared she was no longer "gang-involved" or involved in prostitution and had "closed all my social media pages down that were previously related to that old lifestyle."

Mother again attached documents, dated between April and July 2020, to confirm her progress:

- An ARC life coach indicated mother had completed ARC's bootcamp—an intensive training program designed to place participants in a union apprenticeship—in May 2020; the program was "rigorous" with "high standards," required regular drug testing, and had a strict attendance policy; mother had "worked incredibly hard" and tested negative for all random drug tests; and mother was employed as an apprentice with the painters' union as of June 2020.

---

[17]    Mother continued to attend 12-step meetings and meet with her sponsor via Zoom when the COVID-19 pandemic hit.

- The ARC program director and an ARC therapist confirmed mother continued to attend weekly, individual counseling sessions; as of June 2020, mother had "successfully remained sober and recently celebrated 9 months of sobriety," had a sponsor, was actively engaged in recovery group work outside of her individual therapy, had completed a 10-week anger management course, and had completed a parenting course at another organization.
- Mother's sponsor confirmed her continued participation in meetings.
- Brilliant Corners repeated mother's accomplishments.
- Journey Out confirmed mother had completed an eight-session prostitution diversion program in April 2020, and described mother as a "model [p]articipant" and a "great example" for others in the program.
- Motivational Recovery Services reported mother had completed, as of March 12, 2020, the outpatient program she began in September 2019 and was participating in recovery support services, including attending weekly group and individual sessions; and confirmed mother's test results had been negative since September 2019.
- Certificates confirmed mother's completion of a 15-session parenting class in June 2020 and 10 weeks of group anger management therapy in April 2020.
- Mother's interim driver's license issued July 15, 2020.

On August 18, 2020, the juvenile court, through a different judicial officer, denied mother's petition without a hearing on the ground it did "not state new evidence or a change of circumstances."

**DISCUSSION**

Mother's sole contention on appeal is that the juvenile court abused its discretion by denying her August 2020 section 388 petition without first providing her an evidentiary hearing.

**1.** ***Applicable law and standard of review***

Section 388 provides for modification of juvenile court orders when the moving party—here, mother—can demonstrate a change of circumstance or new evidence *and* that the requested change is in the child's best interests. (§ 388, subd.(a)(1); *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The juvenile court must hold an evidentiary hearing on a section 388 petition only if the petitioner makes a prima facie showing of both elements. (Cal. Rules of Court, rule 5.570(d)(1), (e), (f); *In re Marilyn H.* (1993) 5 Cal.4th 295, 310; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.) "A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause." (*In re G.B.*, at p. 1157.) Thus, the parent is "not required to establish a probability of prevailing on [the] petition." (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432-433 (*Aljamie D.*).)

Section 388 was designed as an " ' "escape mechanism" '. . . [to] allow[ ] the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) Thus, the court must construe the petition liberally in favor of its sufficiency, so that "if the petition presents *any* evidence that a hearing would promote the best interests of the child, the court must order the hearing." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460-461 (*Angel B.*).) "The petition may not be conclusory. . . . Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner

22

will make" at the hearing.  (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  A prima facie case "is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing."  (*In re G.B., supra*, 227 Cal.App.4th at p. 1157.)

Moreover, the allegations must "describe specifically how the petition will advance the child's best interests."  (*In re G.B., supra*, 227 Cal.App.4th at p. 1157.)  The parent's showing is more difficult after reunification services are terminated—which occurred here in April 2019—as the parent's "interest in the care, custody and companionship of the child [is] no longer paramount."  (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.)  At this point, " 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child."  (*Ibid.*)  "In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case."  (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.)

We review the summary denial of a section 388 petition for abuse of discretion.  (*In re G.B., supra*, 227 Cal.App.4th at p. 1158.)  An abuse of discretion occurs when the juvenile court exceeds the bounds of reason by making a determination that is arbitrary, capricious, or patently absurd.  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)

2. ***The court abused its discretion when it denied mother a hearing on her section 388 petition***

The juvenile court summarily denied mother's second petition by checking the box on the judicial council form that the petition did not state new evidence or a change of circumstances.

23

To support a section 388 petition, the change in circumstance or new evidence must demonstrate "the problem that initially brought the child within the dependency system" has been "removed or ameliorated." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612 [explained differently, "the circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate"].)

When the court denied mother's first petition in December 2019, it concluded mother's evidence she had participated in (and apparently completed) an outpatient treatment program, had obtained a sponsor and was going to meetings, and had participated in counseling, did not demonstrate "an actual change of circumstance." Thus, to the extent mother's August petition reasserts that evidence, it does not provide anything new.

We also agree mother's evidence that in 2020 she completed new anger management and parenting classes, and continued to participate in individual therapy, group therapy, and 12-step meetings, is not really "new evidence" (or a change of circumstance). As DCFS notes, mother had engaged in all of those services—through the same or different providers— *before* the court terminated her reunification services. We cannot conclude, however, that mother's petition and attached exhibits "fail[ed] to reveal *any* change of circumstance or new evidence [that] might require a change of order." (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414, italics added (*Jeremy W.*).)

Most importantly, while mother had only about two months of sobriety in December 2019—based on her re-start of the outpatient treatment in September 2019—by August 2020, mother had *maintained* her sobriety for more than 10 months,

24

confirmed by mother's service providers.[18] Moreover, mother did not limit her efforts to sustain her sobriety and cease her risky behavior—problems directly relating to R.K.'s removal—to her participation in aftercare meetings, groups, and counseling, as she had before. Mother presented evidence she had: completed ARC's bootcamp and met its high standards (which required drug testing), enabling her to secure a full-time, stable union job with benefits; completed a prostitution diversion program, staying on to support and to be an example for other women in the program; and removed all social media traces of her prior involvement in prostitution and gang affiliation.

Although not alleged in the sustained section 300 petition, mother's apparent gang affiliation and prostitution undoubtedly contributed to her substance use and put R.K. at risk, affecting her ability to reunify with him.[19] As DCFS noted in its August 2019 LMI, mother's continuation with that lifestyle demonstrated "she [was] not ready nor willing to parent, nor to change her behaviors." Liberally construed, mother's new evidence showed she took significant steps to renounce that lifestyle, demonstrating her resolve not only to maintain her sobriety

---

[18]    As DCFS notes, mother did not provide toxicology reports with her petition. But mother did not simply allege this fact— mother's providers confirmed mother had been drug testing and had tested negative, and ARC confirmed mother had "successfully remained sober."

[19]    For example, in a text message mother purportedly sent to her former roommate she said she couldn't "trap sober." Mother also had a history of leaving R.K. with inappropriate babysitters while she prostituted or prostituting with him.

and change her behavior, but also to make good choices for R.K's benefit. Mother's ability to graduate from ARC's rigorous bootcamp (one of only five women in her cohort), and to secure a union job with benefits, also showed her commitment to stay sober and to provide R.K. with security and stability.[20]

We do not disagree with DCFS's description of mother's past behavior as reflecting a "pattern of successfully participating in and completing treatment programs," followed by "repeatedly engag[ing] in dangerous and risky behaviors without regard for [R.K.'s] wellbeing." We cannot agree, however, with DCFS's assertion that, given this past behavior, mother merely presented evidence of "changing," rather than "changed," circumstances. (See, e.g., *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 ["petition which alleges merely changing circumstances . . . does not promote stability for the child or the child's best interests" where selection of child's permanent home is delayed to see if parent "might be able to reunify at some future point"].)[21] Rather, as we discussed, mother's sobriety in combination with the new evidence of the other steps mother took to stabilize her life reflects a significant change in her lifestyle that, if credited, shows she has broken that pattern. In any event, as mother

---

[20]     Mother declared R.K. motivated her "to live responsibly to be at work every day, early, and take care of myself so I can best take care of him."

[21]     In contrast to mother, the parent in *In re Casey D., supra*, 70 Cal.App.4th at pp. 42-43, 48-49, had about four months' sobriety, had not begun a 12-step program, and had not completed a "significant requirement" of her treatment plan.

26

notes, to obtain a hearing she needed only to present evidence of "*any* change of circumstance or new evidence which might require a change of order." (*Jeremy W., supra*, 3 Cal.App.4th at pp. 1413-1414, italics added; see § 388, subd. (a)(1) [parent may petition to modify prior order "upon grounds of *change* of circumstance *or* new evidence" (italics added)].)

Similarly, we reject DCFS's contention that 10 months of sobriety was too brief a period for mother to demonstrate she had "sufficiently ameliorated the issues" that resulted in R.K.'s dependency for purposes of making a prima facie showing. Although 10 plus months, around 330 days,[22] is shorter than the length of parents' recovery in the cases where an evidentiary hearing was required that mother cites (e.g., *Jeremy W., supra*, 3 Cal.App.4th at pp. 1413, 1415 [mother was sober for more than one year]; *Aljamie D., supra*, 84 Cal.App.4th at p. 432 [mother had clean drug tests for more than two years]), it is much longer than the three months to 200 days of sobriety deemed insufficient to show a change of circumstance in the cases DCFS cites (e.g., *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081; *In re Mary G.* (2007) 151 Cal.App.4th 184, 206; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423-424; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."]).

---

[22]     Mother tested negative for drugs on September 6, 2019 at her outpatient treatment program and filed her petition 332 days later, on August 3, 2020.

27

In any event, as we have said, mother "was not required to establish a probability of *prevailing* on her petition." (*Aljamie D., supra*, 84 Cal.App.4th at pp. 432-433, italics added.) Mother made a showing that she had left behind her dangerous lifestyle, remained sober, and was capable of providing a safe and stable environment for R.K.—in other words, that she had ameliorated the primary reasons for R.K.'s out-of-home placement. Even after viewing the totality of the evidence in the light most favorable to the juvenile court's order, the only reasonable conclusion is that mother's new evidence—if credited and liberally construed—established a prima facie case of a change of circumstance. Accordingly, the juvenile court abused its discretion when it found otherwise.

The court did not comment on mother's allegation that her proposed change—the return of R.K. to her custody or reinstatement of her reunification services—would be in R.K.'s best interest. "[I]f a parent makes a prima facie showing of a change of circumstance such that a proposed change in custody *might* be in the child's best interest, then the juvenile court *must* hold a hearing." (*Angel B., supra*, 97 Cal.App.4th at pp. 461, 463-464 [noting the factors vary with each case, but "each child's best interests would necessarily involve eliminating the specific factors that required placement outside the parent's home"].)

The bond between R.K. and mother was never disputed during the dependency case. Mother's petition alleged they continued to "maintain[ ] a deep bond," she loved R.K., and wanted to provide for and protect him. She described their weekly visits and daily telephone conversations and how she has provided for R.K.'s needs. Mother also declared she was ready and wanted "to be able to provide [R.K.] with stability

28

and security, and provide him with all the opportunities and care [she] never had while growing up." She wanted "to be able to read with him, help him with homework, provide him with healthy food and the clothes he needs, take him on regular outings, give him emotional support and guidance, have conversations with him, and generally provide care for him on a daily basis."

The return of a child to his parent is the most permanent plan and affords greater stability than legal guardianship. (*See In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1218 [describing return to parental custody as "the most desirable permanent plan," in case where parent sought to terminate legal guardianship under section 388]; *In re J.C.* (2014) 226 Cal.App.4th 503, 527 [after termination of reunification services, section 388 petition seeking return of custody or to reinstate services "must establish how such a change will advance the child's need for permanency and stability"].) If mother can now safely care for R.K., as she alleged in her petition, then returning R.K. to her custody might be in his best interests given their undisputed ongoing relationship and bond. Accordingly, mother's petition established a prima facie case that setting aside the court's order terminating reunification services might be in R.K.'s best interests, requiring the court to hold an evidentiary hearing. (*Angel B., supra*, 97 Cal.App.4th at p. 461.)

We express no opinion on how the court should rule on the merits of mother's section 388 petition. We decide only that mother made the required prima facie showing to merit a hearing—the existence of new evidence or a change of circumstance, and the presentation of some " 'evidence that

29

a hearing would promote the best interests of the child.' " (*Jeremy W., supra*, 3 Cal.App.4th at p. 1414.)[23]

## DISPOSITION

The August 18, 2020 order denying mother's August 3, 2020 petition under Welfare and Institutions Code section 388 is reversed. The matter is remanded for the juvenile court to conduct an evidentiary hearing on the merits of mother's section 388 petition, including on any evidence developed subsequent to the filing of her petition.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P.J.                    ADAMS, J.[*]

---

[23]    At a hearing the court will be able to obtain input from R.K.'s legal guardian, DCFS, minor's counsel, and possibly R.K., who was too young to express his preferences to DCFS.

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.